LOS ANGELES TRUST DEED & MORT-GAGE EXCHANGE, Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Markets, David Farrell, Oliver, J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr. and Stanley C. Marks, Appellants,

v.

SECURITIES AND EXCHANGE COM-MISSION, Appellee.

No. 16245.

United States Court of Appeals Ninth Circuit.

Feb. 17, 1959.

Rehearing Denied March 30, 1959.

Paul J. Foley, Los Angeles, Cal., for appellants Trust Deed & Mortgage Exchange and David Farrell.

Morgan Cuthbertson, Laguna Beach, Cal., for appellants, Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Markets, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr., and Stanley C. Marks.

Thomas G. Meeker, Gen. Counsel, David Ferber, Asst. Gen. Counsel, Pace Reich, Atty., Securities & Exchange Commission, Washington, D. C., F. E. Kennamer, Jr., Chief Enforcement Atty., S. F. Regional Office, Securities & Exchange Commission, San Francisco, Cal., for appellee.

Before STEPHENS, Chief Judge, and HEALY and BARNES, Circuit Judges.

BARNES, Circuit Judge.

The Securities and Exchange Commission (sometimes hereinafter referred to as the SEC) filed a complaint for an injunction against three corporate defendants: Los Angeles Trust Deed & Mort-

gage Exchange, Trust Deed & Mortgage Exchange, and Trust Deed & Mortgage Markets, to prevent the sale of certain alleged securities.[1]

An answer was filed generally denying all allegations in the original complaint.

Pursuant to order of court duly obtained, the plaintiff filed on October 8, 1958, an Amended and Supplemental Complaint.

Count I was the same in the Amended Complaint as in the original. Count II added the following material facts as having not been stated by defendants to their customers: (e) "the losses sustained by investors"; (f) the sources of the funds used to inventory or "warehouse" notes secured by deeds of trust; (g) the financial condition of the corporate defendants; (h) the fact that this action had been brought by the SEC; (k) the background, integrity, and quali-

fications of the officers and personnel of the corporate defendants.

Counts III and IV in the Amended Complaint were enlarged by reference to and inclusion of enlarged Count II, and Count V remained the same.

Said Amended Complaint also alleged for the first time that the three corporate defendants "have been and now are insolvent and unable to meet their current liabilities, and the funds received * * * by defendants from investors under the 'Secured 10% Earnings Program' have been and are now in jeopardy."

On the same date, October 8, 1958, when the Amended and Supplemental Complaint was filed, the SEC enlarged its demands, by separate petition, demanding a preliminary injunction and the appointment of a receiver. The Amended and Supplemental Complaint prayed for a final judgment restraining

---

1. Each corporate defendant was charged in Count I of the original complaint with using the mails and means of transporation in interstate commerce "to sell and offer to sell securities, namely, evidences of indebtedness, investment contracts and receipts for and guarantees of such securities, issued by the defendants * * * arising out of and in connection with the offering for sale and selling by the defendants of promissory notes secured by deeds of trust covering residential and other real estate situated within the State of California, in accordance with an investment plan and program, involving various collateral agreements and undertakings by the defendants" designated as a program through the use of a prospectus and otherwise. (Sec. 5(a) and (c) of the Securities Act of 1933, 15 U.S.C.A. § 77e(a) and (c).)

The same defendants in Count II were charged with a violation of § 17(a) (3) of the Securities Act of 1933, 15 U.S. C.A. § 77q(a) (3), in that in selling the "securities" herein described, they allegedly engaged "in transactions, practices, and a course of business which operate and would operate as a fraud and deceit upon the purchasers of such securities," specifying ten particular misrepresentations, and in failing to state material facts, i. e., (a) the speculative nature of the investments; (b) the method used in reinvestment, and

the lack of certainty as to continuing on this basis; (c) the legal distinctions between first and second deeds of trust; (d) the distinctions between trading in fungible securities listed on regulated national securities exchanges, and the defendants "open market trading."

The same defendants in Count III were charged with obtaining money and property by untrue statements of material facts, as alleged in Count II, a violation of § 17(a) (2) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (2).

The same defendants and some individual defendants in Count IV are charged with using the mails and instrumentalities of interstate commerce to effect sales of securities by deceptive and fraudulent devices, by engaging in the acts described in Counts II and III, and as to the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Exchange, in using the term "Exchange," an alleged violation of § 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o (c) (1), and rule, 17 C.F.R. 240.15c1–2.

The same defendants in Count V are charged with use of the mails and means and instrumentalities in interstate commerce to sell such securities described above, without registering as a broker or dealer, in alleged violation of § 15(a) of the Securities Exchange Act of 1934, as amended 15 U.S.C.A. § 78o(a).

the three corporate defendants and their officers from using the mails or any means or instruments of transportation or communication in interstate commerce to sell or offer to sell said securities, "namely, evidences of indebtedness, investment contracts or receipts for or guarantees of such securities, issued by the defendants Los Angeles Trust Deed and Mortgage Exchange, Trust Deed and Mortgage Exchange or Trust Deed and Mortgage Markets," without registering the same, or by use of the misrepresentations previously listed, or without taking steps to prevent the statements made from being misleading, or by using the word "exchange"; and the appointment of a receiver.

Several affidavits and a supplemental affidavit were filed in support of this motion by the SEC, and affidavits in opposition thereto filed on behalf of defendants.

On October 17, 1958, the district court heard (a) the defendants' motion for an immediate trial; (b) the plaintiff's motion for a preliminary injunction and appointment of a receiver.

Hearing was had and evidence taken on October 17th, 21st, 24th, 27th and 30th, and on November 4th, 6th and 7th, 1958.

Defendants' motion for an immediate trial was granted and trial set for December 9, 1958. From an examination of the transcript of record, however, it appears that the hearing of the motion for appointment of receiver developed into a full scale hearing of many, if not all, issues raised by the amended complaint and the plaintiff's motions.

On November 7, 1958, the court below issued a preliminary injunction and appointed a receiver. No findings of fact or conclusions of law were made by the district judge, although the court's order provided that it "reserves jurisdiction to amend and supplement the preliminary injunction, and order appointing receiver by definitive findings of fact, conclusions of law, and further order to be settled before the Court on or before November 13th, 1958."

After an order shortening time was made,[2] Findings of Fact and Conclusions of Law were signed and filed on November 12, 1958.[3]

2. It is noted that the order shortening time required service on defendants' counsel on or before 2:00 p. m. on November 12, 1958, the settlement to be at 3:00 p. m. on that same day. The acknowledgement of service shows that service was effected at 2:38 p. m. on November 12th, 1958, on counsel for certain defendants, and at 2:43 p. m. on November 12th, 1958, on the counsel for other defendants. Thus, as it was expressed by one counsel for defendants, he was given seventeen minutes notice of the settlement of the findings in an eighteen page document. Cf. Rules 3 and 7, Local Rules, U.S.Dist.Ct., Southern District of California, West's Ann. Cal.Code; Fed.R.Civ.P. rules 52(b), 65 (d), 28 U.S.C.A.

3. *Findings of Fact and Conclusions of Law, II—The Investment Plan* reads as follows:

"1. Defendants are in the business of buying notes secured by deeds of trust, principally second deeds of trust, covering residential and other real estate situated within the State of California,

and reselling such securities to members of the investing public under the 'Secured 10% Earnings Program' and the 'Secured 10% Reinvestment Program.' An investor may, if he wishes, buy a note and deed of trust outright and make his own collections. Investors, however, are encouraged to leave their notes with defendants for collection; if this is done, defendants undertake to remit by check each month an amount equivalent to 10% 'earnings' on the amount paid in by the investor and to reinvest the balance; or defendants undertake to reinvest all of the money collected from the maker of the note. As a medium for reinvestment, the investor is sold another note, the title to which is retained in one of the corporate defendants. The investor, in effect, buys the second note on the installment plan. The investor is charged with the purchase price of the second note, together with interest on his unpaid balance at 10%, and is credited with the amounts paid in from time to time. The defendants represent that 10% 'yield' or 'earnings' can be obtained without risk, and

defendants undertake to screen, process, collect and repurchase or resell the notes and deeds of trust so sold to investors.

"2. The operations of defendants involve the sale of securities in at least three senses. The note secured by the deed of trust delivered to the investor is, as a note and evidence of indebtedness, a security by express definition [note 2]; similarly, the receipt issued by defendants evidencing the receipt of the investor's funds and the deposit of such funds in a special trust account, [note 3] pending selection by defendants and acceptance by the investor of a note and deed of trust, is also a security by definition; and the sale of the note and deed of trust, accompanied by the collateral undertakings to screen, process, select, service, collect, repurchase or resell, in accordance with the general plan of investment held out to the investor, in the light of the express and implied representations made by defendants, constitutes the sale of an investment contract within the statutory definition.

"3. The defendants are selling not mere individual isolated notes; they are selling neatly done-up packages of rights and expectations, by virtue of which the investor gets not only a note, a deed of trust, a title policy, a fire insurance policy and an assignment, but the representation and assurance that the loan has been selected, screened and processed by defendants to meet the investor's individual investment needs; that defendants will service and collect the loan, and if need be handle foreclosure thereof; that all the investor has to do is sit back and receive a monthly check equivalent to 10% on his investment; and that, if the investor is dissatisfied or wishes to withdraw, the corporate defendants will repurchase or arrange for the resale of the note and deed of trust. There is an implied guarantee against loss of principal and of a fixed rate of return, and, if the investor so elects, the defendants undertake to keep the [money] coming in continuously reinvested. The defendants recognize that very few, if any, of the investors, many of whom reside a great distances from the State of California, where the makers of the notes reside and where appraisals, collection and foreclosure proceedings must be carried out, have any knowledge of, or in fact any interest in, the solvency of the makers of the notes or the quality of the underlying security. On the contrary, it is implicit in the defendants' program that investors must rely upon defendants in order to realize the promised 'secured 10% earnings' and the rapid pyramiding of their investments which the defendants hold out as inducements to investors.

"4. No registration statement under the Securities Act of 1933 has been filed or is in effect in respect of the securities offered by the defendants despite a clear written warning by the Commission that such registration is required.

"5. The Court finds that defendants' 'Secured 10% Earnings Program' and 'Secured 10% Earnings Reinvestment Program' constitute a single and integrated plan and scheme of investment which has been and is being held out to members of the investing public as a means by which investors may rely upon the ability, skill, industry and capital resources of the defendants to bring such investors an assured and certain 10% earnings and 'automatic capital appreciation,' without effort insofar as investors are concerned.

III—Evidence of Fraud.

"1. The defendants have introduced into the mails and the channels of interstate commerce many thousands of brochures, and other selling literature describing their 'Secured 10% Earnings Program' and 'Secured 10% Earnings Reinvestment Program,' in addition to advertising their investment plan through the media of newspapers, periodicals, radio and television. The admitted purpose of this mass advertising of defendants' investment program has been to 'condition' the minds of members of the investing public throughout the United States and foreign countries. By these means the defendants have led investors to rely upon the following, among other representations: * * *"

[Here appears (a) to (n) precisely as alleged in the Amended Complaint, except that the words "secured 10% Earning Accounts" are added to (h), and the Exchange is found to have been maintained by Los Angeles Trust Deed & Mortgage Exchange rather than by all three defendants in (i).]

"The evidence establishes that the foregoing representations singly and cumulatively are untrue, deceptive and misleading.

"2. In so 'conditioning' the minds of investors and in leading them to believe that the defendants' 'Secured 10% Earnings Program' and 'Secured 10% Reinvestment Program' constitute a safe, secure and certain method of realizing

'earnings' of 10%, together with a means of pyramiding small investments to enormous totals through defendants' 'automatic reinvestment program,' the defendants have carefully and artfully avoided disclosure of the following, among other material facts, concerning their investment plan:

"a) The speculative nature of investments under the defendants' 'Secured 10% Earnings Program,' 'Secured 10% Earnings Accounts,' or 'Secured 10% Earnings Reinvestment Program.'

"b) The method used in arranging for the monthly reinvestment of investors' funds under the 'Secured 10% Earnings Reinvestment Program,' or the lack of certainty that monthly collections can be continuously reinvested in prime deeds of trust, in order to establish a capital appreciation measured by a yield of 10% compounded monthly over any substantial length of time.

"c) The distinctions and differences between first deeds of trust and second deeds of trust.

"d) The distinctions and differences between trading in fungible securities listed and registered on national securities exchanges offering auction markets in such securities, subject to regulation and control by such exchanges and by Federal and State regulatory agencies, including the Securities and Exchange Commission, and the 'open market trading' on an option basis in notes secured by deeds of trust conducted by defendants through Los Angeles Trust Deed & Mortgage Exchange.

"e) The losses sustained by investors under the 'Secured 10% Earnings Program' or 'Secured 10% Earnings Accounts.'

"f) The source of funds used by defendants to inventory or 'warehouse' notes secured by deeds of trust.

"g) The financial condition of Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets.

"h) The action brought by the Securities and Exchange Commission in this Court charging the defendants with violations of the registration and anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, and the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets with violations of the broker-dealer registration requirements of the Securities Exchange Act of 1934.

"i) The background, integrity or qualifications of the officers or directors of or personnel employed by the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets, including the fact that C. W. Cannon, former comptroller of Los Angeles Trust Deed & Mortgage Exchange, has been convicted of grand theft and disbarred from the practice of law.

"3. The defendants' deception of investors has met with marked success. During the last fiscal year Los Angeles Trust Deed & Mortgage Exchange received more than $5,000,000 in investors' funds, at the time of the hearing on the motion the Company was receiving in excess of $1,000,000 monthly, and as of September 30, 1958, the Company had been entrusted by investors with $1,158,877, which remained uninvested.

"4. The list of misrepresentations made by the defendants is seemingly endless. It is important, however, for the Court to make specific mention of at least two such areas of misrepresentation.

"5. *First:* The defendants have represented and indeed continue to represent that funds received from investors are segregated and held in a separate trust account. This representation is false. No such trust account has existed since March 1957. On the contrary, since defendants' investment scheme began to assume substantial dimensions, the defendants quickly, but without informing investors, abandoned the fiction of segregating investors' funds in a special trust account, and thereafter commingled such funds with the general funds of Los Angeles Trust Deed & Mortgage Exchange, and have since used them indiscriminately for general corporate purposes, including, contrary to defendants' express representation to investors, the inventorying or 'warehousing' of deeds of trust, and the financing of debit balances of investors under the 'automatic reinvestment program.' [note 4] For example, as of February 28, 1958, Los Angeles Trust Deed & Mortgage Exchange had been entrusted with $329,375, which at that time remained uninvested. The entire balance of the Company's bank account on that date was only $31,982. Similarly, as of September 30, 1958, the Company had been entrusted with $1,158,877 in cash by investors, but the Company had only $1,046,537 cash in bank, and there were *current* accounts payable totaling $355,948. This commingling and misappro-

The November 12, 1958, order for preliminary injunction and order appointing receiver contained an order that it "be and it is entered as of November 7th, 1957," (One year before the date of the original restraining order) and "is intended by the Court to supersede the Preliminary Injunction and Order Appointing Receiver signed by the Court on that date." [sic] So far as we are informed from the record before us, this clerical error has never been corrected.

The order of November 7, 1958 granted a preliminary injunction and appointed a receiver without the making of any findings of fact or conclusions of law. This violated the rules of the district court in at least three particulars: (1) it did not set forth the reasons for its issuance; (2) it was not specific in its terms; (3) it did not describe in reasonable detail, but merely by reference to the complaint, the act or acts sought to be restrained. Rule 65(d), Fed.R.Civ. P. Mayo v. Lakeland Highlands Canning Co., 1940, 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774. Appellants filed a timely appeal from the order granting the preliminary injunction and the appointment of the temporary receiver. Fed.R.Civ.P. 73(a) and (b).

Appellants applied to a judge of this Court for a temporary stay of the order for preliminary injunction and the appointment of a receiver. This was temporarily granted on November 13th, 1958, until the matter could be heard by the same panel of judges who heard this appeal. As a result of such hearing, an order staying the preliminary injunction and appointment of receiver was issued, and a further restraining order restricting defendants was issued, and other orders necessary for a speedy hearing of this appeal were made.[4]

---

priation of funds entrusted to the defendants constitute a serious and indefensible breach of trust. Supplementing this finding of breach of trust, the Court must find on the evidence that as early as February 28, 1958, and continuing until the present time, the corporate defendants have been and are insolvent at least in the sense that as trustees they have been and are unable to meet their obligations to investors. There is, moreover, substantial evidence to the effect that the corporate defendants have been and are insolvent in the bankruptcy sense.

"6. *Second:* The representation that the defendants Los Angeles Trust Deed & Mortgage Exchange maintain facilities for and conduct 'open-market trading' in trust deeds and mortgages on the same basis that the leading stock exchanges function and operate is a complete misrepresentation of the facts. The so-called 'open board trading' by the defendants Los Angeles Trust Deed & Mortgage Exchange has meant nothing more than that the defendant obtains 'options' on deeds of trust which David Farrell, President and Chairman of the Board of Los Angeles Trust Deed & Mortgage Exchange, described as 'trash' and then attempts to sell the trust deeds in a *negotiated* transaction at a price above the option price. Moreover, al-

though defendants' current brochure contains an elaborate description of the 'open-market trading' in trust deeds, by means of which defendants purport to 'stabilize' the market in such instruments for the benefit of investors, for at least the last seven months the 'trading board' has been used only as a partition dividing defendants' new offices. The entire concept of 'open-market trading' in trust deeds as represented to investors has been and is a mere sham and pretense."

4. "Order Staying Preliminary Injunction and Appointment of Receiver: and Restraining Order.

"Upon Application of defendants and appellants, and good cause having been shown therefor,

"It Is Hereby Ordered that the two several orders of the United States District Court for the Southern District of California, one dated November 7, 1958, and providing for a preliminary injunction and the appointment of a receiver; and the second dated November 12, 1958, ordered entered as of November 7, 1957 (sic), intended to supersede the original Preliminary Injunction and Order Appointing Receiver dated November 7, 1958, are, and each of them is, in each and every particular stayed until the hearing of the appeal on its merits heretofore filed from said orders, and each of

On December 14, 1958, appellants filed below their answer to plaintiff's amended and supplemental complaint, raising the question of jurisdiction, denying generally all allegations and raising four affirmative defenses.

Before we consider specifically the points relied on by appellants on this appeal, we comment generally on certain facts disclosed by the record.

(1) The SEC has alleged its causes of action against three corporate defendants: Los Angeles Trust Deed & Mortgage Exchange; Trust Deed & Mortgage Exchange; and Trust Deed & Mortgage Markets. There is no testimony that Trust Deed & Mortgage Markets, a corporation, has sold anything or offered to sell anything, or has any assets or liabilities or ever has had them, or has ever done any business. There is no testimony that Trust Deed & Mortgage Exchange has sold anything, although in the brochures in evidence, its name was used and it offered to sell. The Los Angeles Trust Deed & Mortgage Exchange has both sold and offered to sell.

(2) The SEC has alleged in its amended complaint that these same three corporate defendants "have been and are now insolvent and unable to meet their current liabilities, and the funds received and being received by defendants from

investors under the 'Secured 10% Earnings Program' have been and are now in jeopardy."

In appellee's brief there appears the statement: "In any event, we have seen that LATD is insolvent in that it is unable to meet its debts as they mature."

It is of interest to note that despite such contention in the brief as to the one corporate defendant, and the allegation in the complaint as to *each* of the three corporate defendants, *there is no direct and positive finding of insolvency as to any defendant made by the court below,* although there is a finding that "the corporate defendants have been and are insolvent *at least in the sense that as trustees they have been and are unable to meet their obligations to investors.* There is, moreover, substantial evidence to the effect that the corporate defendants have been and are insolvent in the bankruptcy sense." [Emphasis added.]

The reason no such clear-cut finding of insolvency was made is crystal clear. No evidence appears in the record to substantiate such a finding—in fact little creditable evidence exists to lend it support. The expert for the SEC admitted on cross-examination that the net worth of the Los Angeles Trust Deed & Mortgage Exchange, *i. e.,* the excess of assets over liabilities, showed a positive net worth for each of the four months

them, and until the further order of this Court;

"And It Is Further Hereby Ordered that the defendants and appellants, and each of them, their officers, agents, servants and employees, are hereby restrained from making any withdrawal of funds from the assets and/or trust funds of the corporate defendants and appellants, other than in the regular and ordinary course of business;

"And It Is Further Hereby Ordered that the record and briefs of each party on the pending appeal may, if counsel desire, be typewritten;

"And It Is Further Hereby Ordered that the appeal on the merits is hereby set down specially for hearing at 9:45 A.M. on Friday, January 23, 1959, at the courtroom of this Court of Appeals, located in the Federal Building at Los Angeles, California;

"And It is Further Hereby Ordered that the Appellants' Opening Brief shall be served and filed on or before December 15, 1958; that Appellee's Brief shall be served and filed on or before January 5, 1959; and that Appellants' Reply Brief, if any, shall be served and filed on or before January 13, 1959.

"Albert Lee Stephens
"Chief Judge
"William Healy
"Circuit Judge
"/s/ Stanley N. Barnes
"Circuit Judge
"Dated: November 17, 1958
"Endorsed:
"Filed
"November 17th, 1958
"By: Stanley N. Barnes
"Judge, U. S. Court of Appeals"

preceding the hearing (namely, June, July, August and September 1958) of between $131,000 and $193,000. The larger figure was the last month's net worth. An attempt was made by SEC experts to re-evaluate certain assets of the Los Angeles Trust Deed & Mortgage Exchange by applying an arbitrary write-down figure of thirty to forty percent discount below the face amount of the notes involved, because second trust deeds are bought and sold, generally, at a discount. No attempt was made (nor was it possible by reason of time limitations) by SEC representatives to determine what the actual market value of the trust deed notes were, nor the actual discount at which they had been purchased, either (a) by an examination of the records to determine what discount had been involved in the specific purchases made by defendant Los Angeles Trust Deed & Mortgage Exchange, or (b) by an examination of payments theretofore made on both the first and second deeds of trust (*i. e.,* how "seasoned" they were), or (c) by a physical examination of the value of the security underlying the several trust deeds. There was testimony that the defendant Los Angeles Trust Deed & Mortgage Exchange bought second trust deeds at prices from ten percent to fifty percent below face value. More were bought at a figure approaching the lesser rather than that approaching the greater discount. The SEC's thirty percent deduction was admittedly an arbitrary deduction, not justified by any *facts* in evidence, but solely an opinion or guess as to an average.

The evidence before the court showed that on September 30, 1958 (the last date available before the hearings below) the Los Angeles Trust Deed & Mortgage Exchange had:

| | |
|---|---|
| Current Assets of | $1,592,153.03 |
| Fixed Assets of | 61,595.00 |
| Other Assets of | 71,002.10 |
| or Total Assets of | $1,724,750.13 |

Of the current assets, $1,046,537.34 was in cash. On that same date, it had:

| | |
|---|---|
| Current Liabilities | $ 370,027.03 |
| Trust Funds | 2,464.53 |
| Customer's Accounts | 1,158,877.74 |
| Capital, Reserves and Earnings | 193,380.83 |
| Total Liabilities of | $1,724,750.13 |

The $193,380.83 mentioned above is the figure described by Mr. Rheinschild, expert witness for the plaintiff SEC, as the excess of assets over liabilities, that is, the "positive net worth."

Thus, without the benefit of findings or other determinations of whether the money on hand was properly characterized as trust funds or non-trust funds; or whether it had been placed in the proper account; or properly or improperly listed in an account designated as "Customer's Accounts" rather than "Trust Funds"; we can come to but one conclusion—the same conclusion that inferentially was reached by the trial court —there was here no proof of actual insolvency of any corporate defendant.

(3) This is a most unusual case in that there is no evidence in the record of any *loss* to any purchaser of any trust deeds sold by defendant Los Angeles Trust Deed & Mortgage Exchange. There *is* evidence of dissatisfaction by several of such purchasers; and of misrepresentation both by brochure [5] (based on interpretation of the language used) and by salesmen.[6] Thus, of more than two thousand "accounts," there is in this record, evidence that only a small per-

5. Plaintiff's Exhibit 4, p. 5: "Upon receipt your money is deposited in a *separate trust account* for customer's money." [Emphasis added.]

6. Affidavit of Weber (R. 108 in support of Motion for Preliminary Injunction and Appointment of Receiver); Affidavit of Lehnhof (R. 150 in support of Motion for Preliminary Injunction and Appointment of Receiver). The remaining affidavits disclose use of mails and interstate sales, but no complaints.

centage of the Los Angeles Trust Deed & Mortgage Exchange account holders were dissatisfied with what they had received, up to the date of trial.

There is evidence that the language "You may change, alter or cancel your instructions",[7] as used in a brochure does *not* mean to defendants that one can obtain a *refund* of moneys if not satisfied, although some purchasers did obtain refunds.[8] Whether such criticized language constitutes a representation that a *refund* will be made is open to serious doubt.

Of course, evidence that every present purchaser of second trust deeds is presently pleased with his purchases would not prove that the plan or system of purchasing and selling second deeds of trust, as pursued by defendant Los Angeles Trust Deed & Mortgage Exchange, is either economically or financially sound or prudent, or that ultimate collapse, with resultant financial loss to thousands of purchasers will not or would not occur.

On oral argument counsel for the SEC agreed that this plan presently being pursued by defendant Los Angeles Trust Deed & Mortgage Exchange would not *necessarily* be unsuccessful. It would come to grief only if the present economic climate of this area, and this period, changed so as to produce (a) large scale foreclosures on residential properties, or (b) a large scale drop in values of improved real estate, or (c) such a scarcity and dearth of "good" second deeds of trust that they could not be purchased at a substantial discount, *i. e.*, their price would rise to par, or a figure close thereto. In the event of any such contingency, a ten percent return could not be obtained.

Thus from the evidence thus far introduced, it seems to be entirely *possible,* though perhaps not economically *probable*, that all purchasers of these second deeds of trust may realize their ten per-

cent return, over the life of the trust deeds, provided there exists honest investment and handling of funds. Any conclusion reached depends on looking into the future.

But it is urged upon us that insolvency or bankruptcy of a defendant need not necessarily be proved to justify the appointment of a receiver, but that it should be done when defendants are engaging in "a fraudulent course of business."

The appellee's brief states "the generally fraudulent conduct of appellants' business is clear from the facts." We do not agree. There can be misrepresentations, and perhaps such misrepresentations must be stopped, and perhaps it is the function of the SEC to stop the making of such misrepresentations. It is claimed some have already been stopped by the defendants. But such misrepresentations do not necessarily or clearly equate with a generally fraudulent conduct of appellants' business.

Appellee's brief further states that the court below found (a) that the appellants' advertising material led investors to rely upon fourteen distinct representations that "singly and cumulatively" were "untrue, deceptive and misleading" and (b) that appellants avoided disclosure of at least "nine material facts." The court below did so find.

We recognize that the findings of the trial judge who heard the witnesses are entitled to great weight. Rule 52(a), Fed.R.Civ.P. We give them that weight. But we are still required to determine if such findings are supported by the evidence. Let us examine such findings and the evidence supporting them.

The first brochure put out by defendant Los Angeles Trust Deed & Mortgage Exchange contained, among other statements, the language hereinabove mentioned in footnote 5, referring to the deposit of customers' money "in a sep-

7. Plaintiff's Ex. 1, p. 10.

8. Affidavit of Noland (R. 172 in support of Motion for Preliminary Injunction and Appointment of Receiver).

arate trust account." Does that mean an account designated as a "trust account," or one designated as a "customer's account?" Is the latter method (dependent upon how it is used) the legal equivalent of a trust account?

Such language relating to deposit in a trust account was removed from the second brochure used by certain defendants. We believe it should have been, and that it should never have been used in the first brochure. Appellee states "subsequent literature in the main contained equally serious misrepresentations." What such equally serious misrepresentations are has not been pointed out to us.

Appellee criticizes the appellants' literature stressing the *safety* of the investment. Safety of an investment is a relative matter, subject to many differences of opinion. So is the precise definition of a "ready market;" of what constitutes "liquidity;" of what constitutes a "seasoned" note.

Appellee presented evidence to show the liquidity of the Los Angeles Trust Deed & Mortgage Exchange may be below that determined to be a minimum in accordance with the "net capital" rule established under the authority of § 15 (c) (3) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(c) (3). Rule 17 C.F.R. 240.15c3-1, generally requires brokers and dealers in securities to maintain a twenty to one ratio of aggregate indebtedness to net capital, "or stated in other terms, requires that the assets of a broker or dealer after certain deductions to insure liquidity, exceed his liabilities by an amount equal to 5% of his aggregate indebtedness." A capital deficiency of the defendant Los Angeles Trust Deed & Mortgage Exchange, as set forth in Exhibits 11, 12, 13 and 14, appears to the SEC to exist, but only after certain arbitrary allocations hereinabove discussed are deducted.

We do not here pass upon the applicability of Rule 17 C.F.R. 240.15c3-1 because we have not here considered and do not pass upon the SEC's authority, or whether that which was here sold is a security, or whether Los Angeles Trust Deed & Mortgage Exchange is a dealer in securities.

▆ We cannot agree that the record supports many of the court's findings:

(1) The record fails to support any finding whatsoever against the Trust Deed & Mortgage Market, a corporation.

(2) The record fails to support any finding of insolvency or bankruptcy of Los Angeles Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Exchange.

(3) The record fails to support any finding that there were specific representations that defendant Los Angeles Trust Deed & Mortgage Exchange would repurchase trust deeds if found unsatisfactory.

(4) The record fails to support any finding of a *direct* guarantee against loss of principal and no such loss was found by the court. A fair reading of the evidence shows that any *implied* guarantee against loss of principal depends on an interpretation of certain facts, and is contradicted by other representations, implied and direct.

The representations made by defendant Los Angeles Trust Deed & Mortgage Exchange [Findings, pp. 7–11, (a) to (n), inclusive] were found to be "singly and cumulatively untrue, deceptive and misleading."

This means that *each* of such statements is found to be untrue, deceptive and misleading. Some of them simply are not false, such as paragraphs denominated in the complaint (a), (c), (d) and (m). As an example, on oral argument, counsel for the SEC did not dispute the mathematical computations contained in (c) or (d). Whether they are deceptive or misleading is extremely doubtful.

Several statements constitute what is ordinarily considered in law mere "puffing." For example, (b) " * * * highest return obtainable with full protection and security." For other examples, (e); parts of (f); parts of (i); and (l).

On the other side of the ledger there are some clear misrepresentations which. have been made, at one time or another, by defendant Los Angeles Trust Deed & Mortgage Exchange. In this category we would place: (g) that "the only legal difference between a first or second deed of trust is the fact that one was recorded prior to the other"; (h) that "the 'Program' assures investors of continuous '10% earnings from [their] savings' " (this assumes that the words "assures" and "continuous" are properly ascribed to the quoted portions of the representations by the general effect of the representations actually made); (k) that the funds received from investors are "deposited in a separate trust account * * *"; and, (n) that the company's own funds are used to "warehouse" deeds of trust.

Similar comments might be made about the nature and extent of the "disclosures avoided" by defendant Los Angeles Trust Deed & Mortgage Exchange.

Thus a finding that *some* of the representations are untrue, deceptive and misleading is justified and supported by the evidence. But does this "conclusively establish the allegations of fraud and deceit" alleged in the amended complaint as the trial court found? And on what items did the trial court rely?

Again we repeat that this record fails to disclose that any one person has been "defrauded," in the ordinary legal sense, out of any money. There are no "investors" or "customers" complaining or a party to this law suit. While this is true, we recognize there may well be "fraud and deceit" within the definition of that term, as used in certain statutory enactments regulating securities (15 U.S.C.A. § 77q) and as opposed to the common law definition of fraud and deceit.

■ The fraud known to common law which required reliance on the alleged false statements and resulting damage to the person addressed is not the fraud required to constitute a violation of § 17 (a) (1) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (1). Bobbroff v.

United States, 9 Cir., 1953, 202 F.2d 389. Cf., Llanos v. United States, 9 Cir., 1953, 206 F.2d 852, 855. Section 77q(a) (2) creates a violation if there be proved any untrue statement of a material fact or any omission to state a material fact, necessary (in the awkward words of the statute itself) " * * * in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Appellee urges that a finding of insolvency is not essential to the appointment of a receiver, relying primarily on Bailey v. Proctor, 1 Cir., 1947, 160 F. 2d 78, and Securities and Exchange Commission v. Fiscal Fund, Inc., D.C.D.Del. 1943, 48 F.Supp. 712, 715.

If we are to differentiate between the fraud of common law on the one hand, and on the other the course of business which operates as a fraud or deceit upon the purchaser of securities, or the sale by means of making an untrue statement of any material fact, or the omission of any material fact (Bobbroff v. United States, supra), it is not unreasonable for us to presume there was intended by the Congress, and that there is, a distinction between the "fraud and deceit" of § 17 (a) of the Securities Act of 1933, and the "gross misconduct" and "gross abuse of trust" of an officer or director of, or the principal underwriter for, a registered investment company. Investment Company Act of 1940, 54 Stat. 841, 15 U.S.C.A. § 80a–35.

With this in mind, we examine the facts of the cases cited by appellee. Bailey v. Proctor, supra, grew out of Aldred Inv. Trust v. Securities and Exchange Commission, 1 Cir., 1945, 151 F. 2d 254, certiorari denied, 1946, 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483, where the investment policy of the investment trust was changed by a majority common stockholder (the trust having no equity value in its common stock) from concentration in investments in public utilities into concentration in "investments" in the horse racing industry, for the principal purpose of allowing the stockholder to obtain control of a race track.

We do not consider the facts of Bailey v. Proctor, supra, comparable to the instant case, nor do we find it controlling. See also, Securities and Exchange Commission v. Insurance Sec., Inc., 9 Cir., 1958, 254 F.2d 642.

Likewise, Securities and Exchange Commission v. Fiscal Fund, Inc., supra, arose under different provisions (§ 22 (e)) of the Investment Company Act of 1940, 15 U.S.C.A. § 80a–22(e). There a management investment company had failed and refused, over a considerable period of time, to redeem its shares upon proper demand made by beneficial share holders upon the custodian (Security Trust Co. of Delaware), and its notification of such option having been exercised, to the company.

The company could not act because it had but one officer, and one director, and he was out of the country with the armed forces. Two signatures of officers were required to sell the underlying assets so that the custodian's request to the company could be complied with in accordance with the Fund's legal obligations. Under these circumstances a receiver was appointed.

Again we cannot consider the facts in Securities and Exchange Commission v. Fiscal Fund, Inc., supra, comparable in any real degree to the facts of the instant case, nor do we find it here controlling or persuasive.

■■■ We do not dispute the fact that it is within the well established power of the federal court, sitting as a court of equity, to order liquidation of a solvent corporation where there is no other course available to remedy a situation that needs solution. Riehle v. Margolies, 1929, 279 U.S. 218, 49 S.Ct. 310, 73 L. Ed. 669. And see Hornstein, A Remedy for Corporate Abuse, 40 Colum.L.Rev. 220, 224 (1940). We do not find such a situation here.

Up to this point, we have not considered whether that which was here sold by defendant Los Angeles Trust Deed & Mortgage Exchange was, in the language of the amended complaint, either (a) an evidence of indebtedness, (b) an investment contract, (c) a receipt for or guarantee of such securities issued by the defendant, or whether (d) what was sold was, in the language of the amended complaint, in accordance with an investment plan and program, involving various collateral agreements and undertakings by the defendants. Nor do we propose to do so here.

We do not necessarily reach such points on this appeal which is solely from the order granting a preliminary injunction and appointing a receiver.

We feel we must point out, however, that irrespective of what a purchase price note secured by a second trust deed may be under California law (Brown v. Jensen, 1953, 41 Cal.2d 193, 259 P.2d 425), the view taken by the Supreme Court in Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S. Ct. 120, 123, 88 L.Ed. 88, as to "its dominating general purpose" of § 2(1) of the Act (15 U.S.C.A. § 77b(1)), and its "generally expressed legislative policy," indicates that

"* * * novel, uncommon, or irregular devices * * * are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a security.' "

320 U.S. at page 351, 64 S.Ct. at page 124.

And in disregarding the Texas law defining what was sold, the same Court said:

"In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to

the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." [9]

We suggest that a proper determination of this case requires a factual finding, in the court below, as to whether there was an investment "in a common enterprise," and whether the purchaser "is led to expect profits solely from the efforts of the promoter or a third party." Securities and Exchange Commission v. W. J. Howey Co., 1946, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244. There must also be a consideration of the various other elements which cause or bar the recognition of a document, plan, course of dealing, or program, as a security—all factors leading to an ultimate conclusion as to whether or not that which is here sold is subject to the Act.

In addition to the matters hereinabove discussed, and entirely apart from them, we find certain procedural matters raised on this appeal that require a reversal of the order entered below.

The deposition of one Charles W. Cannon was taken by plaintiff before trial by stipulation with defendants' counsel. At the deposition, it was "stipulated that all objections, both as to questions or answers, may be reserved until time of trial if the deposition is to be used at that time." This stipulation was unlike the usual stipulation, which is that all objections, "save as to the form of the question" may be reserved until time of trial. This stipulation was broader, reserving *all* objections.

During the hearing, and on October 24, 1958, there was no formal offer in evidence of the Cannon deposition, nor any motion made for that purpose. Casually, it was suggested by plaintiff's counsel, "that the deposition of Charles W. Cannon * * * shall be considered in evidence on behalf of the Commission." The court answered: "Very well. It may be."

Objection was then made on behalf of the defendants. Their counsel called the trial court's attention to the stipulation under which the deposition was taken, and

"* * * the many things in the deposition which are objectionable. The witness was led * * * to all sorts of surmises and guesses and conclusions, to which we have a right to object. So until these objections are ruled upon, that deposition of Mr. Cannon, subject to that stipulation, should not be received in evidence, until we have had a chance to object to them.

"The Court: Well, I will overrule the objection and let it be received."

The depositions of both Cannon and Farrell were thus received in evidence, although for some reason they were not marked in evidence as such, nor given exhibit numbers. The minutes of the court of October 24, 1958, show only the following:

"On motion of Attorney Kennamer [10] it is ordered that depositions of David Farrell and C. W. Cannon may be admitted into evidence. (No number given.)"

The witness Cannon had been a former employee of the defendant Los Angeles Trust Deed & Mortgage Exchange. He had never read the brochure (Ex. 4), but was called upon to explain terms in it. Many, if not most of the questions asked him by SEC counsel were leading and suggestive of the answers desired. He related what "may have been". After disclaiming knowledge of a certain subject, he was asked leading questions concerning that subject matter. He was asked as to his legal conclusions. When he sought to limit his replies to his own knowledge, he was urged by leading questions to go further. He was even

9. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. at pages 352–353, 64 S.Ct. at page 124.

10. Counsel for the SEC.

asked about his "feeling" as to what defendants might or might not be able to do in the future!

The foregoing is sufficient to indicate that the defendants were entitled to make their objections to many of the questions asked on this deposition, and to have the court rule on such objections in an intelligent and orderly manner. This right was taken from defendants by the court's ruling.

We do not know whether the trial court read this deposition. We assume that he did. It contained evidence to which legal objections could have been made and sustained. Much of such evidence went to the heart of plaintiff's case, [11] and defendants' defense, and we cannot view the court's ruling as unprejudicial error. It was error, and standing by itself requires a new hearing of this matter.

The motion for a preliminary injunction and appointment of a receiver, heretofore granted by the orders of the trial court dated November 7, 1958 and November 12, 1958 (entered November 12, 1958 *nunc pro tunc* as of November 7, 1958)[12] is, and each in each and every particular are, set aside and the matter is remanded to the district court for trial in the ordinary course on the issues presented by the Amended and Supplemental Complaint and the answer thereto.

It is probable that both the SEC and the defendants will desire that this matter be heard on its merits at the earliest possible moment. We have no doubt that an early preferential setting for trial can be had.

The Restraining Order heretofore ordered by this Court on November 17, 1958, against defendants and appellants and each of them, and their officers, agents, servants and employees, prohibiting them and each of them from making any withdrawal of funds from the assets and/or trust funds of the corporate defendants and appellants, other than in the regular and ordinary course of business, is continued in full force and effect until further order of this Court.

---

11. Cannon's deposition is specifically mentioned by appellee as a document upon which it relies in seeking an injunction and a receiver (Motion, p. 3, para. III), and portions of it are thought to be important enough to be quoted verbatim in the SEC brief on this appeal, or cited in the brief, on twelve or more occasions.

12. We do not here pass upon the question of the legality of such a *nunc pro tunc* order.